IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:10-CR-222-FL

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | SENTENCING OPINION |
| | ) | |
| BRIAN NICHOLAS THORNE, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the court on its own initiative to memorialize the calculation of defendant's advisory guidelines range and the justification provided by the court for the above-guidelines sentence imposed at hearing on Friday, February 11, 2011.

## BACKGROUND

On July 9, 2010, defendant was charged in a one-count indictment with knowingly possessing in and affecting commerce, firearms and ammunition, having previously been convicted of a crime punishable by imprisonment for a term exceeding one year, in violation of 18 U.S.C. § 922(g)(1). Defendant moved to dismiss the indictment on August 19, 2010, arguing that his conviction for possession of cocaine under state law was not a predicate offense for purposes of § 922(g)(1). The court denied that motion by order entered October 20, 2010.

Following the court's decision on the motion to dismiss, defendant entered into a plea agreement, preserving his right to appeal the issue of whether his previous cocaine possession conviction qualifies as a predicate offense for purposes of § 922(g)(1). Defendant also reserved the right to appeal a sentence in excess of the advisory guideline range established at sentencing. At defendant's arraignment, held November 9, 2010, the court conditionally approved the plea agreement and accepted defendant's plea of guilty.

Defendant appeared before the court for sentencing on February 11, 2010. The court concluded that defendant's prior convictions placed him in the highest criminal history category, and that the relevant conduct pertinent to the instant offense warranted an offense level of 18. The appropriate guideline range, as calculated by the court, indicated that a term of imprisonment of fifty-seven (57) to seventy-one (71) months would be appropriate. However, the court determined that a prison term of seventy-one (71) months was not sufficient to achieve the purposes of sentencing, and instead sentenced defendant to a term of imprisonment of one hundred (100) months.

**DISCUSSION**

Pursuant to statute, the United States Sentencing Commission has promulgated guidelines to guide the court's discretion in sentencing. See 28 U.S.C. § 994. These guidelines, originally mandatory, are now effectively advisory. United States v. Booker, 543 U.S. 220, 245 (2005). However, the guidelines are still an integral component of sentencing, as the court must begin its sentencing consideration by correctly calculating the applicable guidelines range. United States v. Abu Ali, 528 F.3d 210, 260 (4th Cir. 2008) (citing Gall v. United States, 552 U.S. 38, 49 (2007)). After the court has determined the sentencing range set forth in the guidelines, it must allow both parties to argue for an appropriate sentence in light of the factors set forth in 18 U.S.C. § 3553, and must make an individualized assessment based on the arguments and the evidence presented. Id. If the court decides that a sentence outside the guidelines range is warranted, it must consider the extent of such deviation and provide a sufficiently compelling justification. Id. The court must then explain the sentence it has chosen. Id.; see also 18 U.S.C. § 3553(c).

The requirement that a court state its reasons for the sentence it has given does not require "a full opinion in every case." Rita v. United States, 551 U.S. 338, 356 (2007). However,

"[s]ometimes the circumstances . . . call for a lengthier explanation" than normally given. Id. at 357; see also United States v. Carter, 564 F.3d 325, 330 (4th Cir. 2009) ("Th[e] individualized assessment need not be elaborate or lengthy, but it must provide a rationale tailored to the particular case at hand and [be] adequate to permit meaningful appellate review.") (internal quotation marks omitted). Although the court gave a detailed explanation of its justification for imposing an above-guidelines sentence in open court, the circumstances in this case warrant a written explanation be placed on the public docket, as promised to the parties at hearing.

A.  Guidelines Calculations

Prior to sentencing, the probation office prepared a presentence investigation report ("PSR") detailing the offense conduct at issue, which was described as follows:

> On February 20, 2010, officers with the Rocky Mount Police in Rocky Mount, North Carolina, and the Nash County Sheriff's Office in Nashville, North Carolina, were dispatched to Club MXB3, a night club, after receiving a report of a person armed with a handgun in the parking lot. While observing the nightclub for several minutes, officers noticed six to eight males in the middle of the street being loud and jumping in and out of cars at the intersection. The officers also noted there were two males in red jackets in an adjacent parking lot.
>
> The individuals in the street approached the two unmarked police vehicles and bent down as if they were taking cover. One of the individuals advised that a man in the parking lot of Club MXB3, later identified as [defendant] Brian Nicholas Thorne, had a handgun. When officers approached [defendant and another man], Thorne pointed the loaded firearm at one of the officers, who took cover behind his vehicle. A second officer drew his firearm and issued verbal commands for Thorne to drop the gun. After dropping the gun and getting on the ground, Thorne was arrested.
>
> Once handcuffed, Thorne stated, "I thought you were them guys." A search of the defendant revealed a knife concealed in his coat pocket. Upon being taken into custody, Thorne stated, "Man, I did not have no gun, it was my boy." While in the magistrate's office, Thorne made statements to the arresting officer such as, "You are a lucky dude, I should have let my boy drop the hammer on you." Thorne repeated this several times.

Pretrial Investigation Report ¶ 3 (paragraph breaks added).

The offense level for defendant's unlawful conduct was calculated by the probation office to be 24. The probation office began with the base offense level of 14 for a violation of 18 U.S.C. § 922(g)(1). See U.S.S.G. § 2K2.1(a)(6). The probation office added four levels because defendant possessed the firearm in connection with another felony offense (i.e., the assault on a police officer), see id. §2K2.1(b)(6), and added six levels for assaulting a law enforcement officer during the commission of the felony, see id. § 3A1.2(c)(1). Although defendant pleaded guilty and was cooperative, the probation office recommended against allowing a downward adjustment for acceptance of responsibility under § 3E1.1, because defendant assaulted a detention officer while in custody and therefore did not voluntarily withdraw from criminal conduct.

Defendant raised a number of objections to the probation office's calculations, but at hearing he presented argument only as to his objection to the six-point enhancement for assaulting a law enforcement officer.[1] The challenged enhancement is appropriate only if, "in a manner creating a substantial risk of serious bodily injury, the defendant . . . *knowing or having reasonable cause to believe that a person was a law enforcement officer*, assaulted such officer during the course of the offense or immediate flight therefrom." U.S.S.G. § 3A1.2(c)(1) (emphasis added). Defendant

---

[1] Defendant did not wish to be heard on his objection to the court's fact-finding role at sentencing, which was premised on cases such as Apprendi v. New Jersey, 530 U.S. 466 (2000), wishing only to preserve the issue for a possible appeal. His argument is foreclosed by current precedent. See generally United States v. Young, 609 F.3d 348, 357 (4th Cir. 2010); United States v. Brooks, 524 F.3d 549, 562 (4th Cir. 2008). Defendant withdrew his objection to the four-level enhancement under § 4K2.1(b)(6), agreeing with the government and the probation officer that his possession of a firearm was in connection with other felonious conduct regardless of whether he knew the individual assaulted was a law enforcement officer. Defendant did not wish to be heard on his objection to the lack of adjustment for acceptance of responsibility under § 3E1.1. The court noted that, although continued criminal conduct may indicate that a defendant has not fully accepted responsibility for his actions, see, e.g., United States v. Kidd, 12 F.3d 30, 34 (4th Cir. 1993), there was some disagreement among the courts of appeal as to whether *unrelated* criminal conduct is sufficient to deny the downward adjustment. Compare United States v. Banks, 252 F.3d 801, 806-07 (6th Cir. 2001) ("Consideration of . . . unrelated post-plea charges as a factor in determining whether [a defendant] accepted responsibility for the sentencing offenses [is] . . . improper ) with United States v. McDonald, 22 F.3d 139, 144 (7th Cir. 1994) (holding that, in considering whether a reduction under § 3E1.1 is appropriate, the court may look "not only to the charged offense, but also to [continuing] criminal conduct or associations generally"). Defendant's post-plea assault of a detention officer is sufficiently similar to the offense conduct at issue in this case that the Sixth Circuit's concern is not implicated. Defendant has failed to voluntarily withdraw from criminal conduct, and the § 3E1.1 deduction is properly denied.

4

argued that the circumstances surrounding the assault were such that he did not have reasonable cause to believe that the person he was assaulting was a law enforcement officer.[2]

"For a sentencing enhancement to apply, the government must prove the facts underlying the enhancement by a preponderance of the evidence." United States v. Hill, 322 F.3d 301, 307 (4th Cir. 2003). Noting that the facts in the PSR were not sufficient to show that defendant knew that he was assaulting a law enforcement officer, the court directed the government to develop a factual record in support of the six-point enhancement. To meet this burden, the government provided the testimony of Lieutenant Todd Wells ("Lt. Wells"), the patrolman with the Nash County Sheriff's Department who was assaulted by defendant.

Lt. Wells testified that he was in uniform and on patrol in Rocky Mount on February 20, 2010, when he heard officers calling for assistance at the MXB3 nightclub on his radio. He responded to the scene, but the Rocky Mount Police Department already had the situation under control when he arrived. There were fifteen (15) marked patrol cars in the area, many with their blue police lights flashing, and the crowd at the nightclub was dispersing. Lt. Wells took a position at a convenience store across the street from the rear gate of the nightclub's overflow parking lot to monitor pedestrian traffic and to provide additional support in case another altercation broke out. Lt. Wells was driving an unmarked white Dodge Charger.

After about fifteen (15) minutes, Lieutenant Tim Mehus ("Lt. Mehus") of the Rocky Mount Police Department drove over to Lt. Wells in his unmarked black Crown Victoria. Like Lt. Wells, Lt. Mehus was uniformed and on patrol that night. While parked at the convenience store, the two officers observed fights breaking out. They further witnessed a group of five or six individuals

---

[2] Defendant conceded that pointing a loaded firearm at someone constitutes an assault in a manner creating a substantial risk of serious bodily injury. See United States v. Hamptom, 628 F.3d 654, 659-61 (4th Cir. 2010) (discussing the definition of "assault" for purposes of § 3A1.2(c)).

walking towards their location. As these individuals approached the nearby intersection, they began speaking with some motorists waiting for a traffic light to turn green, and it appeared that they were having some sort of party in the street. The individuals then approached Lt. Wells and Lt. Mehus and told them that one of the men in the nightclub's parking lot had a firearm. The man with the firearm was further described by these individuals as wearing a red coat. The individuals then began to hide behind the officer's vehicle as if they were taking cover, although Lt. Wells stated that he did not hear gunfire or see a weapon at that time.

The two officers decided to investigate the individuals' allegations. Lt. Wells pulled out of the convenience store lot, drove straight across three lanes of traffic, and entered the nightclub's gravel parking lot. Lt. Mehus turned right out of the convenience store driveway and then turned left at the next intersection, winding up on the street perpendicular to the one Lt. Wells had crossed. He then remained parked adjacent to the parking lot that Lt. Wells had just entered. As he was slowly driving through the parking lot, Lt. Wells saw an individual in a red coat, later identified as defendant. A second individual was near defendant. Lt. Wells eased his car towards defendant at about five miles per hour. When Lt. Wells' vehicle was about twenty-five (25) to thirty (30) feet away, defendant turned and raised his firearm in the direction of Lt. Wells.

When he saw the firearm, Lt. Wells immediately slammed on his breaks and laid down in his vehicle to take cover. He heard Lt. Mehus yell at defendant to drop his weapon. Noticing that defendant was now looking at Lt. Mehus, Lt. Wells rolled out of his vehicle and took cover behind the driver's side tire. He drew his weapon and also commanded defendant to drop the firearm. When Lt. Wells revealed himself, defendant immediately dropped his weapon and was placed in custody. Defendant stated that he thought Lt. Wells was one of "them guys." Defendant also denied having a firearm, and told Lt. Wells that he was lucky that defendant had not "let [his] boy drop the

hammer on you." That is, Lt. Wells was lucky that defendant had not directed his confederate in the parking lot (who was also taken into custody) to shoot Lt. Wells.

Based on this testimony, the government argued that a reasonable individual would have known that the individual in the unmarked Dodge Charger was a law enforcement officer before raising the gun in his direction. The government pointed out that shortly before the encounter there had been a significant police presence in the area, that the individuals who approach the vehicles of Lt. Wells and Lt. Mehus to discuss defendant's gun possession recognized them as law enforcement officers, and that defendant did not immediately drop his firearm when ordered to do so by Lt. Mehus. Defendant, on the other hand, argued that it was equally reasonable for him to have assumed that the white Dodge was being driven by one of the individuals who approached Lt. Wells and Lt. Mehus. Defendant stated that there had been altercations that occurred at the nightclub, that the individuals would have approached defendant from the same direction as Lt. Wells, and that Lt. Wells was in his unmarked police car when defendant pointed the weapon at him.

Although it was a close question, the court found that the government had not met its evidentiary burden that defendant reasonably should have known that Lt. Wells was a law enforcement officer. In addition to the arguments raised by counsel, the court relied on the fact that Lt. Wells laid down in his car and later took cover in such a way that it was not obvious he was in uniform. The court also believed that defendant's conduct in immediately dropping his firearm once it became apparent that Lt. Wells was in fact a uniformed officer was consistent with his statement that he was not aware that the Dodge was being driven by a law enforcement officer. In short, the court credited defendant's statement that he thought the vehicle contained "them guys," meaning the individuals who had earlier approached Lt. Wells and Lt. Mehus.

7

After rejecting the six-point enhancement under § 3A1.2(c)(1), the court determined that the relevant offense level was 18. It was undisputed that defendant's previous convictions garnered him 18 criminal history points, placing him in criminal history category VI. A defendant with a criminal history of VI and an offense level of 18 is subject to an advisory guideline range of fifty-seven (57) to seventy-one (71) months imprisonment.

B.  Above-Guidelines Sentence

After calculating the correct guideline range, the court must allow the parties to argue for an appropriate sentence. Abu Ali, 528 F.3d at 260. The court then must make an individualized assessment based on the factors set forth in 18 U.S.C. § 3553(a), which may result in a sentence outside the advisory guideline range. Id. In addition to the nature and circumstances of the offense and the history and characteristics of the defendant, the court must consider

> the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2); see United States v. Green, 436 F.3d 449, 455 (4th Cir. 2006).

After hearing argument from the parties in this case, the court determined that even a sentence at the top of the guidelines range would be insufficient to meet the purposes of § 3553. The court notified defendant that it was considering an above-guidelines sentence, and offered to continue the sentencing hearing to allow counsel time to further prepare. The court also noted that this would give defendant time to consider whether there was an alternative basis under the

8

guidelines themselves for a departure. After conferring with his counsel, defendant indicated that he was prepared to go forward without a continuance.[3]

The court determined that a sentence of one hundred (100) months was sufficient but not greater than necessary to reach the objectives of § 3553(a) for a number of reasons. First, defendant's extensive criminal history indicated that a longer sentence was necessary to deter criminal conduct, to promote respect for the law, and to protect the public from further crimes of the defendant. Although he had only one previous felony conviction, defendant had sustained at least twenty (20) misdemeanor convictions before his twenty-sixth birthday. In addition, defendant's criminal history indicated criminal conduct of escalating severity. This extensive criminal history placed defendant in the highest criminal history category with room to spare: 13 criminal history points are necessary for category VI; defendant had 18.

Even more than the number of defendant's previous convictions, the court was concerned with the nature of his previous criminal conduct. Defendant's convictions suggested a propensity towards violence (e.g., his 2000 conviction for assault inflicting serious injury and his 2007 and

---

[3] At one time, a sentencing court was required to "first determine whether a departure is warranted under the guidelines and, if so, vary only if the departure is inadequate to achieve a reasonable sentence." See United States v. Godwin, No. 09-4847, 2010 WL 5421372, at *1 (4th Cir. Dec. 28, 2010) (per curiam) (unpublished) (citing United States v. Moreland, 437 F.3d 424, 432 (4th Cir. 2006)). However, in light of the Supreme Court's decisions in Gall and Rita, the court no longer must look to whether a departure would be appropriate before varying. See United States v. Diosdado-Star, ___ F.3d ____, No. 09-4723, 2011 WL 198658, at *6 (4th Cir. 2011). Moreover, although advance notice is required before the court may consider a departure, see Fed. R. Crim. P. 32(h), "the court [is] not required to provide the parties with any notice of its intent to vary from the advisory range." United States v. Morace, 594 F.3d 340, 344 (4th Cir. 2010) (citing Irizarry v. United States, 553 U.S. 708 (2008)).

In light of Diosdado-Star and Morace, the court was not required to first consider a departure or to provide advance notice to defendant before varying upwards from the guidelines range. Nevertheless, recognizing that "[s]ound practice dictates that judges in all cases should make sure that the information provided to the parties in advance of the hearing, and in the hearing itself, has given them an adequate opportunity to confront and debate the relevant issues," Irizarry, 553 U.S. at 715, the court felt it appropriate to allow defendant the opportunity to take additional time before the court announced an above-guidelines sentence. See id. at 716 ("[A] district judge [should] consider granting a continuance when a party has a legitimate basis for claiming that the surprise [of a sentencing variance] was prejudicial."). As already noted, defendant informed the court that he was able to proceed and wished to stand on the arguments already presented as to the § 3553(a) factors.

2008 convictions for simple assault) and a lack of respect for authority (e.g., his 2007 conviction for resisting a public officer). His two previous convictions for assault with a deadly weapon also indicated a propensity to use a firearm in his criminal endeavors. In 2004, he assaulted a woman by pointing a revolver at her and demanding sex. In 2005, he threatened and then shot at two individuals during the commission of a robbery.

The offense conduct underlying the instant offense convinced the court that defendant is still using firearms inappropriately and would continue to do so unless given a lengthy sentence. Although defendant did not know that he was assaulting a law enforcement officer, the court questioned the wisdom of brandishing a firearm in the parking lot of a nightclub and pointing it at a moving vehicle. The court noted that the parking lot had recently been filled with police officers, and that they were still present at the scene when the crime was committed. Even if he didn't know that the individual driving the car was a police officer, the immediate resort to violence in the presence of law enforcement indicates that defendant is reckless and poses a danger to others.

The court also considered defendant's conduct after being placed in custody. The court noted that defendant showed absolutely no remorse for assaulting Lt. Wells, instead telling him that he was lucky not to have been shot by defendant or his confederate. While awaiting sentencing, defendant threatened a detention officer and then punched him in the face after the officer refused to give defendant another meal tray. Defendant said that he had no problem "dropping" an officer. The court noted that this conduct indicates an absolute disrespect for the law and for authority.

Lastly, the court stated its belief that a longer sentence was needed to allow defendant to obtain much needed treatment during incarceration. As defense counsel noted, defendant requires substance abuse treatment and mental health treatment, including anger management lessons. He also requires medical attention, having been shot on multiple occasions in the past. Defense counsel

also stated that defendant needs to be rehabilitated before he can comply with authority and be a law-abiding citizen. Defendant has never held a job, and he wishes to obtain his GED and get vocational training while incarcerated.

## CONCLUSION

The court's sentence of one hundred (100) months is almost two-and-a-half years longer than a sentence at the upper end of the advisory guidelines range would be. It is the court's hope that this additional time will allow defendant to gain the skill set and additional maturity necessary to function in society. The longer sentence is also necessary to protect the public, to deter this type of conduct, and to promote respect for the law. There is a high likelihood of recidivism in this case based on defendant's past conduct, but this sentence may serve as the much-needed wake-up call that will set defendant back on the right path.

This the 17th day of February, 2011.

_____
LOUISE W. FLANAGAN
Chief United States District Judge